COURT OF APPEALS
SECOND DISTRICT OF TEXAS
FORT WORTH
NO. 2-02-351-CV
 
JIM MABREY                                                                        APPELLANT
 
V.
 
SANDSTREAM, INC.                                                                 APPELLEE
 
------------
 
FROM THE 236TH DISTRICT COURT OF TARRANT COUNTY
 
------------
 
OPINION
 
------------
I. INTRODUCTION
        Appellant 
Jim Mabrey (“Mabrey”) appeals from an order granting Appellee SandStream, 
Inc. (“SandStream”) a temporary injunction prohibiting Mabrey from, among 
other enumerated acts, ”mak[ing] any commercial, business, or personal use” 
of SandStream’s confidential, trade secret, and proprietary information. In 
three issues, Mabrey complains that the trial court abused its discretion by 
granting the temporary injunction because SandStream presented no evidence of a 
probable right to relief on its claims against Mabrey; SandStream presented no 
evidence of a probable, imminent, and irreparable injury pending trial on the 
merits; and the temporary injunction is overbroad and vague in violation of 
Texas Rule of Civil Procedure 683. We will affirm.
II. THE CONTROVERSY
        SandStream’s 
goal was to design the first “converged” architecture for delivering 
television, telephone, internet, movies, and games, integrated into one service 
delivered to residences through one physical medium, fiber optic networks, using 
an internet protocol (“IP”). SandStream’s CEO, Patrick Robbins, together 
with another individual and Tom Wendt, a computer scientist with extensive 
experience in technology and business models for internet services, formed the 
company in September 1998.
        Robbins 
raised investments of over forty million dollars from friends, relatives, 
vendors of equipment such as Cisco Systems and Nortel, and other individual 
investors. With those funds, SandStream’s team of engineers worked for four 
years researching, designing, and developing technology for its multicast 
network operations center in Lewisville, Texas. This technology included digital 
IP set-top-box hardware and software, a conditional access system, an end-to-end 
network for IP digital packet television, high-speed internet data and voice, 
and integration of off-the-shelf equipment. The team also obtained content 
agreements with numerous cable companies, movie companies, and television 
networks.
        Mabrey, 
a developer of planned residential communities, contacted SandStream in January 
2002 to explore using SandStream’s proposed converged services for homes in a 
subdivision he was developing in Denton County. SandStream presented Mabrey with 
a product demonstration at its facility in Lewisville. Mabrey hired engineering 
consultants who conducted technological and business due diligence 
investigations of SandStream. However, SandStream first required a nondisclosure 
and confidentiality agreement from Mabrey’s company, Residential Broadband 
Services, Inc. (“RBS”). Mabrey signed that agreement on February 1, 2002.
        Mabrey 
initially invested $120,010 in SandStream on March 21, 2002, in return for 
stock. He furnished “bridge” financing in April 2002 in the form of a loan 
of an additional $600,000, taking a senior secured position to Cisco’s lien of 
eighteen million dollars for equipment it had sold SandStream. Ultimately, 
however, Mabrey did not contract with SandStream for services for his proposed 
residential development.
        Irving 
Napert, an independent consultant for Sundance Square Development, was searching 
for telecommunications services for the Sundance Square 40-block entertainment 
and residential development in downtown Fort Worth. During the same time that 
Mabrey was working with SandStream, Napert approached SandStream to see if its 
technology would be suitable for Sundance Square. Napert attended a meeting and 
tour of SandStream’s operations facility in January 2002. SandStream presented 
a proposal and business model to Napert.
        Napert 
signed a nondisclosure agreement with SandStream on January 24, 2002, had 
subsequent meetings with SandStream representatives, and reviewed additional 
business models provided by SandStream. Ultimately, Napert was permitted to see 
all of SandStream’s backup financial information supporting its business plan. 
However, Sundance Square’s management did not enter into an agreement for 
SandStream’s service.
        SandStream 
had been in financial difficulty since the end of 2001. By March 2002, 
SandStream had missed at least two payrolls to all of its employees. On May 24, 
2002, in default on its loan from Cisco and unable to meet its May payroll, 
SandStream laid off all but nine of fifty-two employees. SandStream is still 
attempting to raise capital but retains only four unpaid employees now with no 
engineers, and the company remains several months away from deployment of its 
service.
        On 
August 22, 2002, SandStream sued Mabrey, Napert, a number of former employees of 
SandStream, and Fiber.TV, a new company formed by Napert and two of the former 
SandStream engineers in June and July 2002. SandStream alleged that the 
individual defendants formed and intended to operate Fiber.TV as a direct 
competitor of SandStream, with the sole purpose of improperly using 
SandStream’s “technology, unique industry relationships, business practices, 
and financial and business models for Defendants’ financial gain.” 
SandStream alleged causes of action against the defendants for breach of 
contract, tortious interference with contract, misappropriation of trade 
secrets, conversion, breach of fiduciary duties, and, as to Mabrey, aiding in 
the breach of fiduciary duties by the other defendants. SandStream sought 
damages, a temporary restraining order (“TRO”), and temporary and permanent 
injunctive relief. 


        The 
trial court issued a TRO against all defendants and, after hearing evidence on 
SandStream’s application for a temporary injunction over a period between 
September 9 and 26, 2002, the trial court granted SandStream a temporary 
injunction against most of the defendants, including Mabrey. Mabrey filed a 
notice of accelerated appeal. 


III. STANDARD OF REVIEW
        The 
sole issue before the trial court in a temporary injunction hearing is whether 
the applicant may preserve the status quo of the litigation’s subject matter 
pending trial on the merits. 

 An applicant must plead and prove three elements to obtain a temporary 
injunction: (1) a cause of action against the defendant; (2) a probable right to 
the relief; and (3) a probable, imminent, and irreparable injury in the interim. 
 


        The 
applicant for a temporary injunction is not required to establish that he or she 
will prevail upon a final trial. 

 The merits of the applicant’s suit are not presented for review. 

 Our review is strictly limited to whether the trial court clearly abused its 
discretion in granting the temporary injunction. 

 We may not substitute our judgment for that of the trial court by vacating or 
modifying an injunction simply because we would have decided otherwise. 

 An abuse of discretion does not occur as long as there is some evidence to 
support the trial court’s decision. 

 Furthermore, an abuse of discretion does not exist where the trial court bases 
its decision on conflicting evidence. 

 As the reviewing court, we must draw all legitimate inferences from the 
evidence in a manner most favorable to the trial court’s order granting a 
temporary injunction. 

 Finally, we note that, where findings of fact are not requested or separately 
filed as in this case, the order of the trial court must be upheld on any legal 
theory supported by the record. 


IV. TRADE SECRET, PROPRIETARY, AND CONFIDENTIAL 
INFORMATION
        Because 
SandStream’s causes of action, as well as the order granting the temporary 
injunction, are based upon alleged improper disclosure and use of trade secrets 
and proprietary and confidential information, we look to the well-developed body 
of Texas law on that subject.
        A. 
Applicable Law
         In 
two landmark companion cases, the Supreme Court of Texas long ago defined the 
rights of owners of trade secrets and proprietary and confidential information. 

 Trade secrets are in the nature of property rights that the law protects 
through both tort and contract principles. 

 “A trade secret may be a device or process which is patentable; but it need 
not be that. It may be a device or process which is clearly anticipated in the 
prior art or one which is merely a mechanical improvement . . . .” 

 A person is liable for disclosure or use of trade secrets if he either (a) 
discovers the secret by improper means or (b) his disclosure or use, after 
properly acquiring knowledge of the secret, constitutes a breach of a confidence 
reposed in him. 


        To 
determine whether a trade secret exists, we apply the test from section 757 of 
the Restatement of Torts, which lists six factors the supreme court has recently 
held are relevant but not exclusive criteria:
(1) the 
extent to which the information is known outside the business; (2) the extent to 
which it is known by employees and others involved in the business; (3) the 
extent of measures taken to safeguard the secrecy of the information; (4) the 
value of the information to him and to his competitors; (5) the amount of effort 
or money expended in developing the information; and (6) the ease or difficulty 
with which the information could be properly acquired or duplicated by others. 



        B. 
Injunctive Relief for Trade Secret Protection
        It 
is well-settled that, in addition to damages, injunctive relief may be granted 
to the owner of a trade secret. 

 Injunctive relief in cases of this type is intended to protect more than just 
secrecy but also to protect against violence to the confidential relationship 
governing the acquisition of confidential information. 

 Importantly, in determining whether to grant a trade secret protection by a 
temporary injunction, a trial court does not determine whether the information 
sought to be protected is, in fact and in law, a trade secret. 

 
 Rather, the trial court determines only whether the applicant has established 
that the information is entitled to trade secret protection until the trial on 
the merits. 


        V. THE EVIDENCE
        SandStream 
offered evidence at the temporary injunction hearing that its technology and 
business models developed through the work of its team of engineers since 1998 
constituted trade secrets and proprietary and confidential information. Robbins, 
SandStream’s CEO, testified to efforts the company took to keep that 
information secret. He testified that the company had applied for a “system 
and method” patent covering the solutions its engineers had found through 
trial and error for delivery of voice, video, and data on a digital network, as 
well as its method of entry of content, recovery from failures, communication 
with other networks, packaging, the process of delivery with encryption 
technology, technology for presenting video, and method of communication with 
the set-top-box.
        Robbins 
further testified that, to protect its research and trade secrets, SandStream 
required nondisclosure agreements from all persons interviewed and hired, all 
vendors, and all potential investors. SandStream’s physical security included 
industry standard mechanisms such as locks, badge readers, cameras, equipment 
cages, and fenced-in vital infrastructure. SandStream used “secure servers,” 
networks with firewalls, access lists for computers, and coded card keys for 
access based on job function of employees. It issued mandatory instructions for 
clearing cubicles and putting away sensitive information prior to tours of the 
facility by visitors and kept visitors out of restricted areas.
        Mabrey 
received a fifty-three page due diligence report from his consultants on March 
19, 2002, summarizing the information disclosed by SandStream for their review. 
Robbins and other current officers as well as former SandStream engineers 
testified extensively at the temporary injunction hearing that the information 
SandStream had disclosed to Mabrey’s consultants was trade secret, 
proprietary, and confidential information. According to that testimony, 
Mabrey’s consultants worked for weeks in labs at SandStream, observing the 
results of tests, and conducting business audits. Many SandStream employees 
worked full time on the investigation, assisting Mabrey’s consultants. 
SandStream provided full access to its technology and employees to Mabrey. The 
final due diligence report for Mabrey, Robbins said, was a fair representation 
of the state of SandStream’s technology, proprietary information, trade 
secrets, and innovations as of March 2002.
        Russ 
Ramsland, SandStream’s Vice President of Finance, testified that he was 
involved with the negotiation and potential transactions with Mabrey. He 
testified that he allowed Mabrey’s consultants to come in and review 
SandStream’s business plan and that the plan was confidential and was 
developed specifically by SandStream’s engineers and executives. Ramsland also 
testified that, upon review, the details of the plan with Mabrey’s consultants 
included providing at least twenty-five business models and took weeks of work, 
consuming virtually all of his team’s time and all of the lab and deployment 
teams’ time.
        Allen 
Easty, chief scientist for SandStream, was in charge of intellectual property 
for the company, gathering ideas and patents, and bringing in other companies as 
partners. Tom Wendt, as one of the original founders of SandStream, was Vice 
President of Technology and was responsible for strategies in raising money. 
Easty and Wendt, aware of SandStream’s financial bind, had discussions about 
forming Fiber.TV possibly as early as April 2002, even before the employees were 
laid off in May. Wendt registered the domain name of “Fiber.TV” on May 24, 
2002, the day they were laid off. Some of the laid-off engineers met several 
times at his house and discussed what and how they would build a converged 
system, “rethinking” the product and services, and developing a business 
plan for a new company. The new company, Fiber.TV, was incorporated in July, 
with Napert, Easty, and Wendt as the incorporators. Napert agreed to be the CEO.
        Robbins 
testified that Mabrey knew SandStream was running out of money. According to 
Robbins and Ramsland, Mabrey made verbal promises and assurances from February 
through May 2002 to SandStream for funding of fifteen to twenty million dollars 
in addition to his earlier investment and loans. However, SandStream received no 
additional funding from Mabrey.
         Mabrey 
does not dispute that, on or about July 18, 2002, he invested $30,000 in 
Fiber.TV. Napert and Wendt testified that Mabrey arranged for additional funds 
of $35,000 for Fiber.TV as a loan. Former SandStream engineers were paid fees 
out of those funds for work they did for Fiber.TV as “consultants.” 

 Napert and Wendt testified that the amounts provided by Mabrey to Fiber.TV were 
part of a total of $500,000 that Mabrey agreed to obtain for Fiber.TV by a 
written agreement. 


        On 
July 26, 2002, SandStream’s CEO received a copy of an investment “flier” 
for Fiber.TV, faxed to him by a potential SandStream investor. The flier 
announced, among other claims, that: “Fiber.TV is the entertainment and 
communications content service provider for Fiber-to-The-Home (FTTH) and it is 
the company that solved the complex issues” involving fiber-to-the-home. The 
overview further stated that the “founders” of Fiber.TV had developed 
digital packet television, “true IP video television distribution with 
converged telecommunications and internet services.” Robbins testified that 
those claims represented, instead, what SandStream, itself, had accomplished 
over four years, and the strategies of Fiber.TV were “identical” to those of 
SandStream.         Robbins 
further testified that the term “Fiber.TV” was a term first developed and 
used at SandStream. He testified that the representations and claims made in the 
overview of Fiber.TV on its website were “all” identical to SandStream’s 
accomplishments and strategies, which took SandStream four years and forty 
million dollars to develop, whereas Fiber.TV was formed a little over a month 
before it published its claims on the website. Mabrey did not testify at the 
hearing on the temporary injunction, but there was also testimony from other 
defendants themselves that Wendt was “pitching” Fiber.TV as simply deploying 
what had been developed at SandStream. Their testimony was undisputed that the 
Fiber.TV facility or office had no lab, no satellite dishes, and no rooms for 
engineering or testing. Easty admitted the strategy of the two companies was the 
same. He also admitted he took confidential and proprietary information with him 
when he left SandStream. Wendt admitted that, at Fiber.TV, his decisions will 
include all he learned at SandStream over four years.
        Napert 
testified that he authored the investment “flier,” and acknowledged that the 
flier’s representation that Fiber.TV was the “leader” in IP communications 
inferred that Fiber.TV had a competitive edge in the marketplace. Both companies 
were competing for the same customers, and both were pursuing the same companies 
as “business opportunities.” The Fiber.TV “team” referred to in the 
flier consisted of SandStream’s former engineers. Fiber.TV could not have 
negotiated agreements, as it claimed, with networks such as ABC, CBS, FOX, ESPN, 
Disney, and ShowTime in two months, when it took two years for SandStream to 
negotiate such contracts. Fiber.TV had no “pending patents” in hand, 
contrary to its representations; that claim was a “lie.” The only pending 
patent the defendants had was SandStream’s, not Fiber.TV’s, as the flier 
asserted.
        Napert 
further admitted that the statement in the flier that no entity other than 
Fiber.TV has a true digital packet distribution system was “absolutely 
false.” The strategy of Fiber.TV to provide the “end-to-end solution” was 
exactly the same as SandStream’s. There was testimony that Fiber.TV had not 
done any of the things stated on the flier that it had claimed. SandStream filed 
this suit shortly after Robbins obtained the copy of the Fiber.TV investment 
flier.
VI. PROBABLE 
RIGHT TO RELIEF
        A. 
Breach of Contract
        Mabrey 
first contends the trial court abused its discretion by granting the temporary 
injunction against him because SandStream presented no evidence of a probable 
right to relief on its alleged cause of action for breach of his nondisclosure 
agreement. Mabrey does not argue that the information disclosed to him through 
his due diligence does not constitute trade secrets or confidential information. 
Indeed, the testimony was undisputed that the information furnished to Mabrey 
represented SandStream’s technology and constituted trade secrets and 
proprietary and confidential information. 

 
 Instead, Mabrey argues that the trial court abused its discretion in finding 
that SandStream established a probable right to relief based on its breach of 
contract claim by misapplying the law to the terms of his nondisclosure 
agreement. He contends that the terms of that agreement allowed him to invest in 
Fiber.TV because they expressly permitted him to enter into transactions 
“similar to” the investment agreement that he and SandStream had 
contemplated in entering into the nondisclosure agreement.
        Mabrey’s 
letter agreement, with SandStream, entitled “Confidentiality—Due 
Diligence,” provided that each party would provide certain “Evaluation 
Material,” for the exclusive purpose of analyzing the parties’ proposed 
transactions. The provision Mabrey relies upon states that each party 
acknowledges and agrees that each party “may . . . (i) refrain, for any 
reason, from entering into any transaction proposed by the other party; or (ii) 
negotiate or enter into transactions similar to or in lieu of the 
Proposed Transaction.” [Emphasis added.] 


        While 
we agree that Mabrey was not precluded in the agreement from simply investing in 
another company with a competing product or service, we disagree with Mabrey’s 
argument that the terms of the nondisclosure agreement permitted Mabrey to 
decide to invest in Fiber.TV. We decline Mabrey’s invitation to hold that the 
nondisclosure agreement allowing “similar transactions” may be interpreted 
under the evidence presented in this case to allow Mabrey to use SandStream’s 
trade secrets, proprietary, and confidential information acquired by Mabrey 
pursuant to his nondisclosure agreement with SandStream, to decide to invest in 
a company that intended to use SandStream’s secret information to produce and 
market the identical product. Moreover, Mabrey overlooks the nondisclosure 
agreement’s additional provision that the Evaluation Material would be 
reviewed and used by Mabrey for the “exclusive” purpose of analyzing 
his proposed investment with SandStream, “and not for any other purpose 
(including any use which could reasonably result in a competitive 
disadvantage to the disclosing party [SandStream]).” [Emphasis added.]
        In 
interpreting contract language, we ascertain the true intentions of the parties 
as expressed in the entire contract in an effort to harmonize and give effect to 
all provisions so that none will be rendered meaningless. 

 To interpret the nondisclosure agreement as argued by Mabrey, under the 
pleadings and evidence in the record, as further discussed below, would render 
meaningless the condition prohibiting “use” of the Evaluation Material 
furnished to him in a manner that “could reasonably result in a competitive 
disadvantage” to SandStream.
        Mabrey 
contends that there is no evidence that he “disclosed” SandStream’s trade 
secrets and, therefore, that there is no evidence that he breached the 
nondisclosure agreement. The short answer to his arguments regarding disclosure 
is that, despite the references by the parties to the letter agreement as a 
“nondisclosure agreement,” its terms also expressly prohibited “use” of 
the information furnished to Mabrey in his due diligence investigation of 
SandStream.
        Mabrey 
argues that there is no evidence of “use” of the confidential information 
constituting a breach of the nondisclosure agreement because Robbins testified 
at the hearing that his only basis for contending Mabrey breached the agreement 
was his belief that Mabrey violated the “spirit” of the agreement by 
verbally agreeing to be SandStream’s “financier” and, instead, he 
“funded and helped and assisted a number of engineers to leave the company and 
start their own company.” Mabrey characterizes Robbins’s testimony as 
conclusory and further argues that there is no evidence that he could have 
assisted any employees to “leave” SandStream because they were laid off 
before he invested in Fiber.TV. Rather than looking to Robbins’s personal 
beliefs, which we agree are purely conclusory, we must review the record under 
the proper standard, drawing all inferences most favorable to the trial 
court’s order, to determine whether there is “some evidence” under any 
theory supported by the record, that Mabrey breached the agreement by use of 
SandStream’s confidential and proprietary information. 


        Mabrey 
is Fiber.TV’s sole stockholder and sole investor. It was undisputed that 
Mabrey had meetings in his home with Napert, Wendt, and Easty to discuss his 
investment in Fiber.TV. According to Robbins, Mabrey told him in July 2002 that 
Wendt and Easty had approached him to raise money and that Napert had explained 
to him what Fiber.TV was doing. Robbins testified that Mabrey told him that he 
had invested in Fiber.TV and that “they were going to do the same thing as 
SandStream, but cheaper.” Wendt testified that Mabrey did no “due 
diligence” before investing in Fiber.TV, other than the meetings at Mabrey’s 
home, because there was “no need.”
        The 
trial court could reasonably have inferred that Mabrey had “no need” to 
conduct a due diligence investigation on Fiber.TV’s proposed technology and 
business because he already had that same information from his intensive due 
diligence on SandStream. While there is conflicting testimony, when the record 
is viewed under the proper standard, we believe that there is “some 
evidence” establishing a probability that Mabrey “used” the trade secrets 
and confidential information he had previously acquired from SandStream through 
his due diligence investigation of that company as his basis to decide to invest 
in Fiber.TV, and there is “some evidence” establishing a probability that 
Mabrey knew Fiber.TV was founded by former SandStream engineers to develop and 
market the same product, only cheaper, to the competitive disadvantage of 
SandStream. Viewing the evidence in the light most favorable to the trial 
court’s order and indulging every reasonable inference in its favor, we hold 
that the trial court did not abuse its discretion in determining that SandStream 
had a probable right to relief against Mabrey based upon breach of contract.
        B. Aiding Other Defendants’ Breach of Fiduciary 
Duties
        Recognizing 
that the order of the trial court must be upheld based upon any legal theory 
having support in the evidence, Mabrey addresses the remaining causes of action 
pleaded by SandStream. He urges that there is no evidence of a probable right to 
relief on SandStream’s tort claims for tortious interference of contract, 
misappropriation of trade secrets, conversion, or knowingly inducing or aiding 
the other defendants’ alleged breach of fiduciary duties. Even apart from any 
written contract, a fiduciary relationship arises from an employment 
relationship forbidding an employee from using trade secrets or confidential or 
proprietary information in a manner adverse to the employer. 

 The obligation survives termination of the employment relationship. 


        Even 
assuming the parties did not intend Mabrey’s nondisclosure agreement to 
preclude the investment in Fiber.TV, we disagree with Mabrey’s argument that 
SandStream produced no evidence of a probable right to recovery on its claim of 
aiding the other defendants in breaching of their fiduciary duties to SandStream. 
In Elcor Chemical Corp. v. Agri-Sul, Inc., Miller and Kruse were 
employees of Elcor, which manufactured a sulfur fertilizer product that they had 
assisted in developing. 

 Using their knowledge and experience gained in their employment, they 
experimented with the formula in Miller’s garage and developed an improved 
product. 

 They approached a third employee’s brother-in-law to discuss possible 
financing and demonstrated the market potential for their “improved” 
product. 

 The brother-in-law’s company, Caldwell Computer Company (“Caldwell”) 
agreed to advance funding in exchange for a controlling interest in a new 
venture, after its lawyers looked at Miller’s and Kruse’s employment 
agreements with Elcor and advised that there was “little chance for 
exposure.” 

 Thereafter, Miller and Kruse resigned from Elcor and, together with Caldwell, 
formed a new corporation to produce and market their improved product. 

 In the suit against them and Caldwell, the trial court found that the 
information used in making the improved product constituted trade secrets of 
Elcor, that the former employees disclosed that information to their new company 
in breach of their employment agreements, and that they had gone into their 
competing business with the benefit of Caldwell’s aid and encouragement in 
derogation of their confidential relationships with Elcor. 

 Upholding injunctive relief against Caldwell, as well as the former employees 
and their company, the court of appeals stated:
The 
equitable cloak of protection must, of necessity, be full and complete so that 
those who have acted wrongfully and have breached their fiduciary relationship, as 
well as those who willfully and knowingly have aided them in doing so, will 
be effectively denied the benefits and profits flowing from the wrongdoing. 


        As 
previously noted, Mabrey is Fiber.TV’s sole stockholder and sole investor. 
While Mabrey, himself, invested only $30,000 in Fiber.TV, there was some 
evidence that he arranged for an additional $35,000 investment by another group 
and committed in writing to raise funding of a total of $500,000. There was 
testimony that Mabrey’s purpose in providing the funding to Fiber.TV was to 
give the former engineers of SandStream “time to get more money.” This was 
some evidence that Mabrey “aided” the other individual defendants in 
breaching their own fiduciary duties as former employees of SandStream.
        There 
was evidence that Mabrey knew the status of and importance to SandStream of its 
engineering employees such as Wendt, Easty, and other individual defendants, as 
well as their possession of valuable trade secret and confidential information, 
through his due diligence investigation. His due diligence report stated, in 
pertinent part, “[I]t is apparent that each member of the SandStream staff 
contributes the skills and expertise needed to make SandStream successful in 
each of their areas, respectively.” Additionally, the report pointed out that 
the SandStream “technology and business teams have been working together for 
the last three years to define this technology and this market. This team is now 
the only group of experts in this field. In our opinion, SandStream cannot 
afford to loose [sic] any of the technical staff working on this project . . . 
.” There was also evidence that Mabrey knew former SandStream engineers 
planned to use their knowledge gained at SandStream to develop and market the 
same product through Fiber.TV.
        We 
believe the trial court could reasonably conclude from the evidence that 
SandStream established a probable right to relief against Mabrey in aiding and 
inducing breaches of fiduciary duty by the former employees of SandStream. 
Because we have held that there is some evidence to support a probable right to 
relief of SandStream on these claims, it is unnecessary to address 
SandStream’s additional claims of tortious interference with contract, 
misappropriation of trade secrets, conversion, fraud, or conspiracy as to Mabrey. 
We overrule Mabrey’s first issue.
VII. PROBABLE INJURY IN THE INTERIM
        In 
his second issue, Mabrey asserts that the trial court abused its discretion in 
granting the temporary injunction against him because SandStream presented no 
evidence that it faced a probable injury pending trial on the merits. The 
probable injury element includes three equitable components: (1) imminent harm; 
(2) irreparable injury; and (3) the absence of an adequate remedy at law. 

 An adequate remedy at law is one that is as complete, practical, and efficient 
to the prompt administration of justice as is equitable relief. 

 One suffers an irreparable injury if the injured party cannot be “adequately 
compensated in damages or the damages cannot be measured by any certain 
pecuniary standard.” 

 A legal remedy may also be inadequate if an award of damages would come too 
late. 


        Mabrey 
asserts SandStream failed to meet its burden of demonstrating that it faced a 
probable injury because it offered only generalized, conclusory statements from 
its CEO, Robbins, that constituted no competent evidence. Robbins testified that 
SandStream was in the process of raising money and preparing to take its product 
to market and that the activities of Fiber.TV impacted SandStream’s potential 
business partners, investors, and trade relationships.
        When 
asked what the effect to SandStream of Fiber.TV utilizing the proprietary 
information and trade secrets of SandStream as if they were property of Fiber.TV 
and not SandStream, Robbins replied:
I think 
certainly the $40 million that our shareholders have invested, if somebody else 
is allowed to just take that and use it for their own, I think it would have 
irreparable harm to the value of our company because it would create an enormous 
competitor in a new industry.

Robbins also agreed that 
the effect of competition from a company staffed with former employees of 
SandStream who had taken trade secrets, proprietary and confidential information 
would be to eliminate the competitive advantage that SandStream had worked to 
develop and that the resulting potential harm and damage would not be something 
that could be compensated by mere monetary damages to SandStream.
        Mabrey 
also points to Robbins’s testimony during cross-examination, in which the 
following discussion occurred:
Q. 
[Defendants’ Counsel]: Very good.
I’m 
not sure we had finished addressing all of the potential relationships that you 
allege Fiber Television has potentially impeded for SandStream. In other words, 
are there any other potential customers, vendors, whatever that Fiber.TV has 
been in contact with that SandStream also has been in contact with?
 
A. Oh, I 
don’t have any knowledge of what that list would be but certainly all the 
defendants have been at our company for, some of them, almost four years. And in 
that time, there’s probably over 2000 people that came to visit and work with 
these people. So I would say that if it was a threat to our intellectual 
property in our company, there could be an enormous number of customers and 
companies of relationships that they could impede.
 
Q. 
You’re just speculating right now, though, right?
 
A. Yes.
 
Q. You 
have no concrete information to that effect, right?
 
A. 
That’s correct.
 
Q. So, 
in fact, SandStream hasn’t lost any revenue, has it, because of activities of 
Fiber.TV, has it?
 
A. I 
don’t know whether that’s true or not. We all have potential to get revenue 
and I don’t know at this time whether we have actually lost any. I feel as 
though some of our money raising has been impeded.
 
Q. You 
feel as though it’s been impeded. What’s your basis for that?
 
A. The 
relationship that I have with the person that had sent me the fax was one that 
we were going down path of investment. And that was put off track, I believe, by 
this.
 
Q. And 
that’s the company called Glow Networks?

                A. 
That’s correct.
        We 
disagree with Mabrey’s characterization of the testimony and its effect as 
speculative and incompetent. Damages are “inadequate” so as to support a 
temporary injunction if, among other factors, damages are difficult to 
calculate. 

 The testimony of SandStream’s CEO constitutes some probative evidence that 
damages would be difficult if not impossible to calculate to compensate 
SandStream for any injury in the period pending trial on the merits.
        Mabrey 
argues that SandStream was not a “viable company” that could have been 
irreparably harmed because it had no customers as of the date of the hearing, 
had never made any revenue, had no employees drawing a salary, and had only 
three people showing up at the office regularly. Temporary injunctive relief may 
be available, however, to a new business that has not yet entered the market. 

 An irreparable injury exists when unfair competition deprives the initial 
producer of the fair opportunity to market its product. 

 Irreparable harm may be established by evidence that disclosure of confidential 
information could enable competitors to mimic the marketing plans and strategies 
of the applicant and avoid the less successful strategies, resulting in a 
“substantial competitive injury.” 


        Robbins 
testified as to the potential for harm to SandStream as a new competitor in a 
new industry, eliminating within a short time the “competitive advantage” 
that it had taken SandStream four years to develop. Ninety percent of the 
process of development, he said, was in the trial and error of eliminating what 
did not work. He described the value of this knowledge as “massive.” It was 
the “unique” confidential technology and engineering work that gave 
SandStream its competitive advantage and that had given SandStream a “head 
start” in the industry. Defendants Wendt, Easty, and Pruneau acknowledged in 
their testimony that the “assets” of Fiber.TV were the combined knowledge of 
their years of research and trial and error at SandStream. The “team” 
referenced in Fiber.TV’s investment flier is SandStream’s engineers. The 
“inference” in that flier was that Fiber.TV had the “edge” over 
competitors in the marketplace and was the leader in IP communications.
        Expanding 
on his argument that SandStream is not a viable company and, therefore, could 
not have sustained irreparable injury, Mabrey argues the evidence established 
that SandStream has received no funding since May 2002 and that it cannot 
“meet its current debt obligations today.” However, that an applicant for 
injunctive relief from improper use of trade secrets has ceased to do business 
or to use the protected information does not preclude its entitlement to 
injunctive relief. 

 Likewise, we must reject Mabrey’s argument that temporary injunctive relief 
is not warranted because Fiber.TV has not yet entered the market. 


        Finally, 
Mabrey argues that SandStream’s First Amended Original Verified Petition 
alleges causes of action for damages based on alleged fraud and conspiracy, 
making clear that SandStream’s true causes of action are for damages, and 
thereby confirming that SandStream has an adequate remedy at law. We disagree. 
“Simply because the applicant for a temporary injunction asks only for damages 
as ultimate relief does not guarantee that damages are completely adequate as a 
remedy. . . . [C]ircumstances can arise in which a temporary injunction is 
appropriate to preserve the status quo pending an award of damages at trial.” 


        We 
hold that, while there was conflicting evidence, the record viewed in the light 
of the proper standard establishes some evidence that SandStream would suffer 
probable injury resulting in irreparable harm pending trial for which damages 
would constitute an inadequate remedy. We overrule Mabrey’s second issue.
VIII. VALIDITY OF ORDER
        By 
Mabrey’s third issue, he complains that the order granting the temporary 
injunction violates the requirements of Rule 683 by failing to describe in 
reasonable detail what acts by Mabrey the injunction seeks to restrain. 

 
 Mabrey argues that the injunction is impermissibly vague and general because it 
is not limited to information that is secret or not generally available to the 
public other than as a result of a disclosure by Mabrey and that the order is 
not limited, as was Mabrey’s nondisclosure agreement, to information disclosed 
by SandStream “prior to completion of the Proposed Transaction.” We do not 
agree in either respect. The terms of the order specifically refer only to 
“SandStream’s confidential and proprietary information . . . or trade secret 
information,” which necessarily excludes information not generally available 
to the public, and the order is limited in time to information obtained while 
Mabrey was a party to the nondisclosure agreement.
        The 
order is not only limited to SandStream’s confidential and proprietary or 
trade secret information but expressly excludes from its prohibitions any 
information that: “(1) was in the Receiving Party’s possession without an 
obligation of confidentiality prior to receipt from the Providing Party; (2) is 
legally obtained by the Receiving Party from a third party without an obligation 
of confidentiality; (3) is specifically approved by distinctive written 
agreement of the providing Party; or (4) is required to be disclosed in order to 
provide with a judicial order or decree.” 

 We hold that the temporary injunction order satisfies the requirements of Rule 
683 by adequately defining the prohibited conduct concerning SandStream’s 
confidential and proprietary information at issue. 

 We overrule Mabrey’s third issue.
IX. CONCLUSION
        Having 
overruled Mabrey’s issues, we affirm the order of the trial court granting 
SandStream the temporary injunction against him.
 
                                                          ANNE 
GARDNER
                                                          JUSTICE
 
PANEL A:   CAYCE, 
C.J.; HOLMAN and GARDNER, JJ.

CAYCE, C.J. concurs without opinion in the result 
only.

DELIVERED: December 11, 2003